UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 15 CR 260-2 |
| RODERICK GROETZINGER | Judge Jorge L. Alonso |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
"PRESENTENCING MEMORANDUM" GUIDELINE CALCULATION OBJECTIONS[1]**

Defendant RODERICK GROETZINGER knowingly participated in fraud scheme to steal over $2 million from the Victim Company over the course of approximately thirteen years. Defendant's conduct was calculated, deliberate and ongoing, and he has failed to accept responsibility for his actions. As set forth below, the government believes the defendant's advisory Guideline range is 70-87 months' imprisonment and respectfully requests that the Court sentence the defendant to within-guideline sentence – a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.

**I.      The PSR**

The government respectfully disagrees with Probation's calculation of the defendant's total offense level as a level 20. PSR ¶ 32. Specifically, while the government agrees with Probation's calculation of the loss amount (PSR ¶ 23), the government's position is that the defendant should receive a two point enhancement for sophisticated means and should not receive a three point reduction for acceptance of responsibly. Therefore, it is the government's position that the defendant's total offense level is 25.

---

[1] The government reserves the right to file a supplemental sentencing memorandum prior to the defendant's sentencing hearing.

1

Additionally, the government agrees with Probation's calculation of the defendant's criminal history as a level III. PSR at ¶¶ 39-41. A total offense level of 25, combined with a criminal history category III, results in an advisory guideline range of 70 to 87 months' imprisonment.

    A.    <u>Probation Correctly Applied a 16-Point Enhancement Under Guideline § 2B1.1 Because the Defendant Caused a Loss of At Least $2,022,989</u>

The government agrees with Probation that the defendant's offense level should be increased by 16 points, pursuant to § 2B1.1(b)(1)(i), because the loss for which he is responsible is at least $2,022,989, which is more than $1,500,000, but less than $3,500,000. PSR ¶ 23.

A loss determination must be based on the conduct of conviction and relevant conduct that is criminal or unlawful, and the government must demonstrate by a preponderance of the evidence that the loss amount is attributable to that criminal or unlawful conduct. *U.S. v. Littrice,* 666 F.3d 1053, 1060 (7th Cir. 2012). That standard requires only that the fact-finder believe that the existence of a fact is more probable than its non-existence, and for the purposes of determining the loss amount, a reasonable estimate is sufficient. *Id.* A district court's determination of loss amount will only be reversed if the "district court's calculation was not only inaccurate but outside the realm of permissible computations." *Id.,* quoting *United States v. Al–Shahin,* 474 F.3d 941, 950 (7th Cir. 2007).

As set forth below, there is ample evidence to support the government's loss calculation of $2,022,989. The defendant admitted in his plea agreement that he participated in the scheme to defraud the Victim Company with codefendant David Colletti from at least 2000 until 2013. R. 146 at 3. The defendant also admitted that, during the course of the scheme, he used five different companies to submit the false and fraudulent invoices to the Victim Company. *See* R. 146 at 3. As reflected in Government Group Exhibit 1, during the 13 years the defendant participated in the

2

fraud scheme, he submitted at least 51 fraudulent invoices to the Victim Company totaling at least $2,022,989. *See* Government Group Exhibit 1 (GROETZINGER fraudulent invoices chart).

As reflected in Government Group Exhibit 1, the fraudulent nature of every invoice included on the chart is supported by reliable evidence – all of which was previously provided to defense counsel Steven Richards. *See* Government Group Exhibit 1(a)-(i).[2] The supporting documents contained in Group Exhibit 1(a)-(i) include copies of the fraudulent invoices themselves as well as coconspirator and witness statements.[3]

The copies of the fraudulent invoices substantiate the existence of, and the amount associated with, each of the invoices listed in Group Exhibit 1. The invoices themselves also prove that they were submitted to the Victim Company in the names of five different companies that the defendant controlled – Beverage Industry Marketing Services ("BIMS"), Event Services Inc., Event Marketing Network LLC ("EMC"), Rave Media LLC, and Rave Media, a division of BIMS.

The description of the services rendered on the fraudulent invoices, as well as the witness statements contained in Group Exhibit 1(a)-(i), demonstrate that each of the invoices listed in Group Exhibit 1 are fraudulent. As reflected in the witness statements, every invoice listed in Group Exhibit 1 was identified as fraudulent by one or more of the witnesses. Group Ex. 1(a)-(i). For example, Monique Levy, who was responsible for planning the Multi-Unit Food Service Operators ("MUFSO") yearly event, stated that MUFSO events were never held on the dates or at the locations listed on the Events Marketing Network, LLC invoices. Group Exhibit 1(d) at 1-2.

---

[2] All of the underlying documents supporting the fraudulent nature of the invoices contained in Government Group Exhibit 1 have been provided to the Court. *See* Government Group Exhibit 1(a)-(i).

[3] Group Exhibit 1(a)-(i) contains statements from the following individuals: Richard Berman, owner of Berman & Company (Ex. 1(a) & (i)); Carlos Calderon, employment and compensation corporate manager at Cannery Resorts and Casino (Ex. 1(b)); Jennifer Tarulis, chief financial officer at International Food Service Manufacturer's Association ("IFMA") (Ex. 1(c)); Monique Levy, group show director and special events at Penton (Ex. 1(d)); Brian Masilionis, former Applebee's employee (Ex. 1(e)); Brian Esser, corporate counsel and senior director of risk at Ruby Tuesday, Inc. (Ex. 1(f)); and codefendant David Colletti (Ex. 1(g) & (h)).

Levy also stated that the invoices were completely fake and the description of services rendered on the invoices were not services that were even provided at MUFSO events. Group Exhibit 1(d) at 1-2.

Similarly, Jennifer Taruis at IFMA stated that none of the invoices submitted by Events Marketing Network, LLC and Events Services, Inc. that she reviewed were legitimate. Specifically, Taruis stated that there were no records to support the sponsorship listed on the invoices and the invoices contained descriptions of services that would never be associated with the IFMA events listed on the invoices. Group Exhibit 1(c) at 1-2. For example, Taruis explained that the invoices listed things such as booth rentals and furniture packages, but there were no booths or furniture at the stated events. *Id.*

Carlos Calderon from Cannery Casino stated that according to the general manager of Cannery Casino, Cannery Casino was under contract with Anheiser Bush to carry Budweiser products until early 2013, so it would never have done a promotion with the Victim Company anytime prior to 2013. Group Exhibit 1(b).

In addition to the evidence contained in Group Exhibit 1(a)-(i), codefendant Colletti's plea agreement provides evidence of the $2,022,989 loss figure. Specifically, Colletti admitted, under oath, that he was responsible for a loss amount of $8,658,302 – a loss figure that includes the $2,022,989 loss amount associated with the fraudulent invoices listed on Government Group Exhibit 1 and attributable to the defendant. *See* R. 94 at 4-5. As the defendant's coconspirator, Colletti had firsthand knowledge of the entire scope of the defendant's fraudulent conduct. Moreover, Colletti's sworn testimony as to the loss amount, as well as his statements to law enforcement referenced above, are corroborated by other witness statements and documentary evidence. Additionally, Colletti's admissions bear a sufficient indicia of reliability because they

4

are statements against interest. Fed. R. Evid. 804(b)(3); *Williamson v. U.S.,* 512 U.S. 594, 613 (1994) (principle behind Rule 804(b)(3) is that reasonable people do not make statements against their interest unless they are telling the truth).

The government has proven, by a preponderance of the evidence, that the defendant is responsible for a loss amount of at least $2,022,989 and therefore, a 16 point enhancement under § 2B1.1(b)(1)(i) is applicable.

In his sentencing memorandum, the defendant objects to Probation's and the government's calculation of the loss amount and appears to make two distinct arguments in support of his position – one with respect to the evidence relied upon to calculate the loss amount and one with respect to the loss figure itself. R. 238 at 4-8. Both of the defendant's arguments are meritless and should be rejected.[4]

*Defendant's Evidentiary Argument*

The defendant argues that Probation's and the government's loss calculation is not supported by proper evidence. R. 238 at 5. Specifically, the defendant contends that the loss figure must be supported by live witness testimony and evidence of someone with "personal knowledge that the 'relevant conduct' invoices were fraudulent'." R. 238 at 5. The defendant asserts that he "will contest this use of double and triple hearsay to support the calculation of the loss amount" and urges the Court to reject the loss amount contained in the PSR. R. 238 at 4-5. This argument is inconsistent with the applicable law and the Guidelines.

First, the defendant argues that the Court should not adopt the loss amount contained in the PSR because the facts supporting the loss amount are not sufficiently reliable. R. 238 at 4-5.

---

[4] In an attempt to lower his advisory Guidelines range, the defendant makes a series of additional arguments regarding his criminal history and entitlement to a mitigating role reduction. R. 238 at 10-15. These arguments are meritless and will be briefly addressed by the government at the sentencing hearing.

District courts may rely on the PSR in ruling on factual issues in the sentencing context as long as the PSR is based upon sufficiently reliable information. *U.S. v. Moreno-Padilla,* 602 F.3d 802, 808 (7th Cir. 2010); *see also* U.S.S.G. § 6A1.3(a). Where there is an apparently reliable basis for information in a presentence report, "bare denial" is not enough; the defendant must produce "some evidence" calling the presentence report into question, unless the report contains only a "naked or unsupported charge." *U.S. v. Betts-Gaston*, 860 F.3d 525, 539 (7th Cir. 2017). "When a defendant has failed to produce any evidence calling the report's accuracy into question, a district court may rely entirely on the PSR." *U.S. v. Taylor,* 72 F.3d 533, 543 (7th Cir. 1995).

Here, the loss amount contained in the PSR is supported by the government's version of the offense and corresponding exhibit, which sets forth each of the fraudulent invoices used to calculate the loss amount, including the date and amount of each invoice, the specific company the defendant used to submit each invoice, and a description of the false representation contained in each invoice. *See* Government's Version of the Offense & Exhibit Groetzinger Fraudulent Invoices; PSR at ¶ 8. All of the evidence used to calculate PSR's loss amount, including copies of each fraudulent invoice, as well as witness statements and financial records, was provided to defense counsel in a timely fashion. Additionally, Probation substantiated the loss amount contained in the government's loss chart during a telephonic interview with the case agent, who was responsible for collecting and reviewing all of the evidence in the case and who was present for all of the witness statements. PSR at ¶ 9.

The information relied upon to calculate the loss amount set forth in the PSR is sufficiently reliable and the defendant has failed to produce any evidence calling the report's accuracy into question. *Taylor,* 72 F.3d at 543. Therefore, the Court may rely entirely on the PSR in ruling on the loss amount attributable to the defendant.

The Court, however, does not have to rely on the PSR to find that the defendant is responsible for a loss amount of $2,022,989. As mentioned above, the government has submitted a detailed accounting of every fraudulent invoice used to calculate the defendant's loss amount along with overwhelming evidence to substantiate the fraudulent nature of each of the invoices. *See* Group Exhibit 1(a)-(i). This evidence has a "sufficient indicia of reliability to support its probable accuracy" and proves, by a preponderance of the evidence, that the defendant's loss amount is at least $2,022,989. U.S.S.G. § 6A1.3(a).

The defendant attempts to escape this conclusion by arguing that the government cannot rely on hearsay evidence to support its loss calculation and instead, must present live testimony during the sentencing hearing by someone with personal knowledge to sustain its burden. R. 238 at 5-6 (noting that the government has indicated it will not call codefendant David Colletti or the case agent to testify at the defendant's sentencing). This argument is incorrect and is premised on the flawed conclusion that the rules of evidence apply at a sentencing hearing.

It is well established that the Federal Rules of Evidence do not apply to sentencing hearings. *U.S. v. Morales,* 994 F.2d 386, 389 (7th Cir. 1993); U.S.S.G. § 6A1.3(a). Because of the congressional intent to "prevent the sentencing hearings from becoming full-blown trials," a sentencing judge is free to consider a wide range of information, including reliable hearsay evidence, regardless of its admissibility at trial. *U.S. v. McGill,* 32 F.3d 1138, 1143 (7th Cir. 1994) (citing Fed. R. Evid. 1101(d)(4)). The defendant must have a reasonable opportunity to rebut the hearsay evidence used against him, *United States v. Campbell,* 985 F.2d 341, 348 (7th Cir. 1993), but that does not mean the defendant has a right to "cross-examine a person who provided the government with information that was later used during sentencing." *U.S. v. Badger,* 983 F.2d 1443, 1459 (7th Cir. 1993), *cert. denied*, 508 U.S. 928 (1993).

The government is permitted to rely on reliable hearsay information to support its calculation of loss amount, which is what it has done here. *See Badger,* 983 F.2d at 1459 ("Hearsay is an integral part of the sentencing process . . . ."). Contrary to the defendant's contention, the government is not required to present testimony during a sentencing hearing in order to sustain its burden of proof and can rely on witness statements to law enforcement as well as coconspirator proffers. *See id.,* (finding unindicted coconspirator's proffer could be considered to calculate drug amount attributable to defendant at sentencing). The defendant's objection to the evidence relied upon by the government is a wrong statement of the law and the Guidelines, and should be rejected.

*Defendant's Loss Amount Argument*

Second, the defendant disputes the $2,022,989 loss amount itself and makes a series of baseless arguments in an attempt to lower the loss amount associated with his fraud scheme. R. 238 at 6-8. Defendant's arguments on this issue are meritless and undermine the defendants' acceptance of responsibility for his participation in the offense.

The defendant first contends that his loss amount should be $87,000 because $87,000 is the amount involved in the count of the indictment to which he pleaded guilty. R. 238 at 6. This argument rests on the flawed premise that the defendant is not responsible for the loss amount associated with relevant conduct. Under the Guidelines, loss amount includes the loss caused by the offense of conviction, as well as "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.C. § 1B1.3(a)(2); *see also United States v. Baines,* 777 F.3d 959, 963 (7th Cir. 2015). All of the invoices listed in Group Exhibit 1 constitute relevant conduct to the offense of conviction and the loss amount associated with each is properly included in the loss amount attributable to the defendant.

Alternatively, the defendant contends that his loss amount should be $567,810 because, of the total amount of money he fraudulently obtained from the Victim Company, $567,810 is the amount he paid to Colletti. R. 238 at 7. The defendant contends that "it is at least arguable that the amount of $567,810 represents the loss to [the Victim Company] caused by [defendant's] relevant conduct, since [the Victim Company] would certainly not have agreed that one of its employees should receive a kickback from a vendor." R. 238 at 7. This argument is without merit and again ignores both the Guidelines and Seventh Circuit law related to loss amount and relevant conduct.

The Guidelines define actual loss as the reasonably foreseeable pecuniary harm that resulted from the offense and relevant conduct. U.S.S.G. §§ 2B1.1, n. 3(A) & 1B1.3(a)(2); *see also Baines,* 777 F.3d at 963. Here, the pecuniary harm is the total amount of money the Victim Company paid the defendant as a result of the false and fraudulent invoices he submitted. All of the invoices included in the government's loss calculation of $2,022,989 are one-hundred percent fraudulent; they bill the Victim Company for promotional events and services that never took place. *See* Group Ex. 1. It makes no difference what the defendant did with the money after he received it from the Victim Company. The defendant is still responsible for the total amount of money the Victim Company paid as a result of the fraudulent invoices. As seen in Group Exhibit 1, that amount is $2,022,989.

In an attempt to escape this clear conclusion, the defendant claims that over the 13 years he participated in the fraud scheme the Victim Company payed him $567,810 in unearned funds, all of which he gave to Colletti – the defendant did not keep any of the fraudulently obtained money. R. 238 at 7. In support of this position, the defendant cites to Colletti's April 29, 2014,[5]

---

[5] The defendant incorrectly refers to the date of Colletti's interview as April 24, 2014. R. 238 at 7.

statement to law enforcement that Colletti "received *all* the funds from the fraudulent invoices submitted to [the Victim Company] from [defendant's] companies" and assures the Court, without any evidentiary support, that he has "an exact record of that amount" which is $567,810. R. 238 at 7.

The defendant's argument is spurious, disingenuous, and misrepresents Colletti's April 29, 2014, statement in its entirety. What the defendant failed to include in his sentencing memorandum is Colletti's very next statement: "Colletti believes that [the defendant] was giving Colletti all of the funds from the fraudulent invoices *over the past three years* . . . ." Government Exhibit 2 at 23 (Colletti 4.29.14 interview). Colletti's April 29th statement, taken in context, in conjunction with Colletti's subsequent statements to law enforcement, make it clear that Groetzinger collected approximately $2,022,989 – well over $567,810 – from the Victim Company as a result of the fraudulent invoices and that a portion of the money went to Groetzinger.

Finally, the defendant asserts that he will contest "the government's contention that certain invoices are actually false, and/or that [he] caused the claimed losses by relevant criminal conduct or intended these losses." R. 238 at 7-8. In support of this contention, the defendant states that "for many years" he did "legitimate work" for the Victim Company. *Id.* The defendant provides no evidentiary support for these statements.

The defendant was given a list of every fraudulent invoice included in the government's loss calculation and has had ample opportunity to review and analyze all of the government's evidence showing the fraudulent nature of the invoices. Still, the defendant has not identified a single invoice on Group Exhibit 1 as being legitimate and has not provided any evidence to substantiate that any of the invoices in Group Exhibit 1 relate to legitimate services rendered. Instead, the defendant relies on blanket denials and assertions, and implausible justifications to

argue that the government's loss amount is incorrect. The defendant's own self-serving statements are insufficient to call into question Probation's and the government's loss calculations. *See Littrice,* 666 F.3d at 1062-63 (speculation and "unlikely and implausible justifications" insufficient to challenge loss amount); *United States v. Austin,* 54 F.3d 394, 402 (7th Cir. 1995) (rejecting factually unsupported speculation in challenge to loss amount).

Additionally, the government is not disputing that the defendant did legitimate work for the Victim Company. The government did not include any invoices submitted for legitimate work in its loss calculation. In fact, taking a conservative approach, the government did not include any invoices where it was unable to substantiate their legitimacy one way or the other – even if there was evidence suggesting an invoice was fraudulent. To be sure, in its civil suit, the Victim Company held the defendant responsible for submitting 109 fraudulent invoices totaling $3,862,043; the government is holding the defendant responsible for 51 fraudulent invoices totaling $2,022,989. The government's loss calculation of $2,022,989 is an extremely conservative estimate and already takes into account any legitimate invoices submitted by the defendant to the Victim Company.

Because the government has proven the loss amount by a preponderance of the evidence, the Court should find that the loss amount is $2,022,989 and apply a 16-point enhancement, pursuant to § 2B1.1(b)(1)(I).

    B. <u>The Defendant Should Receive a Two Point Enhancement for Sophisticated Means</u>

The defendant created a corporate entity, Events Marketing Network LLC, for the purpose of executing the fraud scheme, and therefore, a two point enhancement for sophisticated means, pursuant to § 2B1.1(b)(10)(C), is warranted. *See* U.S.S.G. § 2B1.1, n. 9(B).

11

The sentencing guidelines call for a two point enhancement when "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means . . . ." 2B1.1(b)(10(C). Application Note 9(B) clarifies that for purposes of this enhancement, "sophisticated means" means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." 2B1.1, n. 9(B). The application note continues, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells . . . ordinarily indicates sophisticated means." *Id*.

Application of the enhancement is proper "when the conduct shows a greater level of planning or concealment than the typical fraud of its kind." *United States v. Knox*, 624 F.3d 865, 871 (7th Cir 2010). However, the Seventh Circuit has made clear that the fact that a defendant could have used "even more elaborate mechanisms to conceal" the fraud does not defeat a finding of sophisticated means. *United States v. Bickart*, 825 F.3d 832, 838 (7th Cir. 2016); *see also United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001) (finding that "sophisticated," as used in an analogous adjustment for tax frauds under U.S.S.G.2T1.1, refers to efforts "that go beyond" but "not necessarily far beyond" the typical case).

Here, the defendant's conduct supports a two point enhancement for sophisticated means. Contrary to the defendant's representation (R. 238 at 8-9), the defendant created the corporate entity Events Marking Network, LLC for the purpose of successfully executing his fraud scheme, namely, to create and submit false and fraudulent estimates and invoices to the Victim Company and to receive the fraudulently obtained funds as a result. *See* U.S.S.G. 2B1.1, n. 9(B) (use of fictitious entities and corporate shells ordinarily indicates sophisticated means). In addition to incorporating EMN, the defendant opened and used multiple bank accounts to receive the

fraudulently obtained funds and to transfer money back and forth between the companies he controlled.

According to Events Marketing Network's articles of incorporation, it was incorporated in April 2006, during the time-period of the ongoing fraud. A review of available bank records for the bank accounts associated with EMN show no business-related deposits aside from those related to the payment of the fraudulent invoices by the Victim Company. According to Colletti, and as reflected in Group Exhibit 1, all of the invoices submitted to the Victim Company by EMN were fraudulent. Group Exhibit 1 & 1(g) at 6.

In addition to creating EMN for the purpose of executing his fraud scheme, the defendant took other deliberate steps to make his fraud scheme difficult to detect. The defendant used five different corporate entities to submit detailed fraudulent estimates and invoices to the Victim Company.[6] The defendant directed payment of the fraudulent funds to multiple bank accounts, opened multiple corporate bank accounts for the purpose of receiving the fraudulent funds, and routinely transferred the fraudulently obtained funds from one bank account to another. The purpose of using multiple entities and multiple bank accounts to execute his fraud scheme was to make the defendant's criminal conduct more difficult to detect and therefore, supports an enhancement for sophisticated means. *Bickart*, 825 F.3d at 838 ("The [sophisticated means] enhancement is aimed at defendants who take deliberate steps to make their criminal activity difficult to detect.").

Additionally, the defendant's conduct was repetitive and long-standing. The defendant participated in the fraud scheme for approximately 13 years and submitted at least 51 fraudulent invoices to the Victim Company under five different entities often during overlapping time-

---

[6] Specifically: Beverage Industry Marketing Services (BIMS), Event Services, Inc., Events Marketing Network LLC (EMN), Rave Media LLC, and Rave Media, a division of BIMS.

13

periods. *See* Group Exhibit 1; *see also Bickart*, 825 F.3d at 838 (finding sophisticated means enhancement applicable where defendant repeatedly fabricated and submitted 1099 forms to corroborate false tax returns).

Because the defendant's fraud scheme involved efforts "that go beyond" the typical case, he should receive a two point enhancement for sophisticated means pursuant to 2B1.1(b)(10)(C). *Kontny*, 238 F.3d at 821.

        C.        <u>The Defendant is Not Entitled to a Reduction for Acceptance of Responsibly</u>

Based on his arguments to date, the defendant should not receive a reduction for acceptance of responsibility. Throughout his sentencing memorandum, the defendant frivolously contests the government's loss amount, offering no legal or factual support for his objections. The defendant's arguments regarding loss amount, as well as his attempt to shift all of the blame to Colletti, completely undercuts his purported acceptance of responsibility. Moreover, no matter how many times the defendant includes the phrase "without in any way retracting, diminishing, or minimizing his acceptance of responsibility," his lack of acceptance is still abundantly clear. R. 238 at 5.

A defendant who enters a guilty plea prior to trial is not entitled to an adjustment for acceptance as a matter of right. U.S.S.G. § 3E1.1, n. 3. The burden rests on the defendant to demonstrate entitlement to the reduction. *United States v. Akindele,* 84 F.3d 948, 956 (7th Cir. 1996). A defendant who falsely denies, or frivolously contests, relevant conduct in the face of convincing evidence to the contrary does not merit a reduction in sentence for acceptance of responsibility. *United States v. Romero,* 469 F.3d 1139, 1149 (7th Cir. 2006); U.S.S.G. § 3E1.1, n. 1(a). Although a sentencing court cannot condition a defendant's reduction for acceptance of responsibility on his admission of details related to crimes other than the offense of conviction, a sentencing court can require that the defendant provide a "candid and full unraveling" of the

14

methods used by the defendant to commit his crime. *United States v. Larkin,* 171 F.3d 556, 558 (7th Cir. 1999).

The defendant's sentencing memorandum contains frivolous challenges to the government's loss amount and clearly demonstrates that the defendant has not accepted responsibility for his actions. The defendant makes a general objection to the amount of loss presented by the government, arguing that the burden is on the government to prove the amount of loss and that the government's evidence is unreliable. The defendant offers nothing to rebut the government's evidence, however, and never offers a legally sound, plausible counterproposal. The defendant's blanket objection to the loss amount in the face of overwhelming evidence can be nothing other than frivolous and is inconsistent with acceptance. *United States v. Gordon,* 495 F.3d 427, 431 (7th Cir. 2007) (no reduction for acceptance where defendant made "frivolous," "non-specific objections to the loss amount in the face of overwhelming evidence"); *United States v. Zehm,* 217 F.3d 506, 516 (7th Cir. 2000) (no reduction after "bare denials to counter the largely consistent stories of several witnesses").

The defendant's objections to the government's loss amount are not made in good faith. A defendant acting in good faith would have identified any specific errors and provided a full and candid unraveling of the loss figure. Instead, the defendant simply states that he will contest the use of the government's evidence to support its loss figure and will contest "that certain invoices are actually false, and/or that [the defendant] caused the claimed losses by relevant criminal conduct or intended these losses." R. 238 at 7-8. Both the Guidelines and the clear authority from the Seventh Circuit mandate that the district court deny acceptance of responsibility to a defendant who frivolously contents relevant conduct – which is exactly what the defendant has done. U.S.S.G. § 3E1.1, n. 1(a); *Lister,* 432 F.3d at 759-60; *Romero,* 469 F.3d at 1149; *U.S. v. Leahy,*

464 F.3d 773, 791-92 (7th Cir. 2006); *U.S. v. Sharp,* 436 F.3d 730, 735 (7th Cir. 2006); *U.S. v. Berthiaume,* 233 F.3d 1000, 1004 (7th Cir. 2000); *Zehm*, 217 F.3d at 516.

**II.    Conclusion**

For the reasons set forth above, the government respectfully requests that the Court find that the defendant's advisory Guidelines range is 70 to 87 months' in prison and impose a sentence of incarceration within the applicable range.

          Respectfully submitted,

          JOHN R. LAUSH
          Acting United States Attorney

By:    s/ Jennie Levin
       JENNIE LEVIN
       Assistant U.S. Attorney
       219 South Dearborn St., Rm. 500
       Chicago, Illinois 60604
       (312) 353-5372