FD-302 (Rev. 5-8-10)                    - 1 of 29 -



FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/22/2014

DAVID COLLETTI, white male, ████████████████
████████████████████████████████████████████
████████████, was interviewed at the Office of the UNITED STATES ATTORNEY
for the Northern District of Illinois, 219 South Dearborn Street, Chicago,
Illinois.  Also present for the interview was Assistant United States
Attorney (AUSA) JENNIE LEVIN, and in their capacity as Attorneys for
COLLETTI, GENE MURPHY and RANDALL BOREK, MURPHY & HOURIHANE LLC, 161 North
Clark Street, Suite 2550, Chicago, Illinois, telephone number:
(312)202-3200.  At the onset of the interview, AUSA LEVIN provided MURPHY
with a copy of a proffer letter related to the interview of COLLETTI.
MURPHY was then given the opportunity to discuss the terms of the proffer
letter agreement with COLLETTI.  After signing the letter, COLLETTI
provided the following information:

        COLLETTI was first hired at MILLER BREWING COMPANY (hereinafter
MILLER) in Milwaukee, Wisconsin in January 1982, as an intern.  COLLETTI
worked as an intern for approximately five months before being hired for a
full-time position in May 1982.  The full-time position for which COLLETTI
was hired was a safety engineer.  COLLETTI described the job duties of a
safety engineer to include: dealing with Occupational Safety and Health
Administration (OSHA) codes; installing conveyors; and addressing worker's
compensation and time/loss issues.  COLLETTI worked in this position for
approximately eighteen months to two years.

        COLLETTI then enrolled in a training program to become an Area
Sales Manager for MILLER.  COLLETTI explained that MILLER offered an
accelerated program in which employees from the brewery were given the
opportunity to train in the field for sales positions.  COLLETTI spent six
to seven months in Chicago, Illinois participating in the accelerated
training program.  Through the training program, COLLETTI was to learn the
operations of the distributors.  At that time, there were nine Chicago area
distributors with whom COLLETTI was working.  COLLETTI advised that the

---

Investigation on  04/29/2014  at  Chicago, Illinois, United States (In Person)

File #  318A-CG-4668147                                Date drafted  04/30/2014

by  SA Laura B. Miller, SA Heather Czubak

This document contains neither recommendations nor conclusions of the FBI. It is the property of the ████████████ and its contents are not
to be distributed outside your agency.

GOVERNMENT
EXHIBIT
Exhibit 2

FBI302 001-000001

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                        , On  04/29/2014  , Page  2 of 29

area sales manager position for which he was training involved merchandising and working with distributors. COLLETTI advised that MILLER wanted the area sales managers to assist the local distributors execute the programs that the brewery was introducing in order to increase sales of MILLER. COLLETTI described the effort as getting MILLER's brand name out in the marketplace.

Upon completion of the area manager training program in Chicago, COLLETTI was promoted to an area manager position in Springfield, Illinois. COLLETTI described his primary job duty was to interface with distributors in order to sell the MILLER brand programs. COLLETTI advised that it was his responsibility to monitor the distributor's execution of MILLER's programs. As an area manager, COLLETTI was also responsible for looking for ways to increase MILLER sales and market share. COLLETTI was in the area manager position in Springfield for approximately seven months. COLLETTI described Springfield as a "Level 7 Market".

COLLETTI was then moved to Des Moines, Iowa, which COLLETTI described as a "Level 8 Market". In Des Moines, COLLETTI was responsible for a larger market. COLLETTI's territory covered half of Iowa, primarily in the western part of the state. COLLETTI's job duties as area manager in Des Moines were similar to those he had as area manager in Springfield. The primary difference between the two positions being that Des Moines was a larger market and so COLLETTI dealt with a greater number of distributors. COLLETTI estimated that he was working with seven distributors in Des Moines.

COLLETTI was in the area manager position in Des Moines for approximately fifteen months and was then promoted to an area manager position in Chicago, which COLLETTI described as a "Level 9 Market". COLLETTI advised that the area manager position in Chicago entailed the same job duties as the area manager positions in Springfield and Des Moines, just on a larger scale. COLLETTI was responsible for working with five MILLER distributors in the northern and western parts of the City of Chicago. COLLETTI was in this position for approximately two years, or possibly less, until approximately 1987 or 1988.

COLLETTI was then promoted to the position of retail sales

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                                  , On  04/29/2014 , Page  3 of 29

manager in Chicago. In this position, COLLETTI's area of responsibility was chain sales. COLLETTI was responsible for working with both on-premise and off-premise chain establishments in order to increase the sales of MILLER products. COLLETTI explained that off-premise chains were places like a grocery store, such as JEWEL, where the beer was not consumed on the premises. COLLETTI described on-premise chains as bars and restaurants where the beer was consumed on the premises. COLLETTI's role entailed expanding distribution within the on and off-premise chains. COLLETTI was in the position of retail sales manager in Chicago for approximately two years.

In 1990, COLLETTI moved to California to be a divisional retail sales manager for MILLER. In that position, COLLETTI was the divisional sales manager over twelve western states, with retail sales managers in each of those states that he supervised. COLLETTI advised that this was the first job he had with MILLER that included supervisory responsibility. COLLETTI supervised between fourteen to sixteen people who held the position of retail sales managers. COLLETTI advised that the retail sales managers covered the twelve states that were within COLLETTI's area of responsibility. COLLETTI explained that the retail sales managers were not equally divided among the twelve states, but instead worked in the various areas based on population and market size. In the position of divisional retail sales manager, COLLETTI worked with the retail sales managers that he supervised to call on retail chains. COLLETTI and the retail sales managers were responsible for implementing programs put out by MILLER, obtaining ad space in weekly newspapers, and increasing shelf space for MILLER products in the retail chains. COLLETTI was supervising the retail sales managers, but also going on sales calls with them to the various retail chains. COLLETTI explained that during this time, MILLER was changing the way it was selling MILLER products. COLLETTI described the sales approach as one that was more sophisticated than merely relying on brand programs. While in the position of divisional retail sales manager, COLLETTI's supervisor was CHRIS MOORE, who had the title of Vice President of Chain Sales. MOORE worked for MILLER in Milwaukee. COLLETTI was in the position of divisional retail sales manager until approximately 1993.

COLLETTI moved back to Milwaukee in 1993 for a promotion to the position of Manager of On-Premise National Accounts. COLLETTI advised that at this time, one person was doing on-premise national accounts and one person was doing off-premise national accounts. In COLLETTI's new position of Manager of On-Premise National Accounts, approximately eight to eleven

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti _____ , On  04/29/2014 , Page  4 of 29

employees reported to him. The employees who reported to COLLETTI were
national chain sales managers. From the time that COLLETTI returned to
Milwaukee in 1993, COLLETTI was reporting to KEVIN DOYLE, who was also
based in Milwaukee. At that time, DOYLE was the Director of National
Accounts. COLLETTI explained that DOYLE was responsible for all national
accounts, both on-premise and off-premise. COLLETTI's former supervisor
CHRIS MOORE had been promoted to Vice President of Sales.

Approximately fifteen months to two years later, COLLETTI's title
was changed to Director of On-Premise National Accounts. At that time,
DOYLE's position was changed to Vice President of Chain Sales, and CHRIS
MOORE was promoted to Executive Vice President of Sales. COLLETTI advised
that the promotions of MOORE, DOYLE and himself were primarily a change in
titles, however, there were some additional responsibilities with these new
titles. COLLETTI explained that at the time of his promotion to Director
of On-Premise National Accounts, the larger chain restaurants such as
APPLEBEE'S were really emerging in the marketplace, and smaller,
independent restaurants were going away. As a result, MILLER was working
on "keeping up" with sales and promotions in the chain restaurants.
COLLETTI explained that MILLER was adding people and support dollars for
the efforts directed at chains, both for on-premise and off-premise
chains. COLLETTI advised that his job duties while he was Manager of
On-Premise National Accounts, strictly involved working with on-premise
national accounts to increase MILLER marketing and sales. COLLETTI
explained that if a MILLER program had been sold into a chain customer
account, COLLETTI was responsible for working with the distributors to make
sure that the program was executed at the local level. COLLETTI gave the
example of a Monday Night Football promotion being rolled out by MILLER.
COLLETTI would go into APPLEBEE's Headquarters in Kansas City and explain
the program to APPLEBEE'S headquarters based employees. COLLETTI
instructed APPLEBEE's employees on how to execute the program and explained
the support APPLEBEE's would receive from both MILLER and the local
distributors.

COLLETTI's job duties changed at the time his title changed to
Director of On-Premise National Accounts in that there was a change in the
on-premise channel at MILLER and the classes of trade that were listed
underneath the on-premise channel. COLLETTI explained that under the
on-premise channel were the following classes of trade: casinos;
concessions; restaurants; cruise lines; bars and taverns; duty free;
nightclubs; and hotels. As Director of On-Premise National Accounts,

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                    , On  04/29/2014 , Page  5 of 29

COLLETTI was in charge of the channel employees listed under the on-premise channel, and those employees were in charge of the aforementioned classes of trades. In addition to the change in his job duties based on the change in the class of trades that reported to COLLETTI, COLLETTI explained that he was also challenged with coming up with new strategies and programs to double MILLER's efforts in on-premise marketing and promotions. COLLETTI described this effort as "going back to grassroots" of MILLER. COLLETTI's goal was to get customers to sample MILLER brand products in on-premise locations. COLLETTI explained that brand loyalty in the beer industry is developed in on-premise locations, which translates to off-premise purchases. COLLETTI explained that at this time, MILLER was losing its share of the market in on-premise consumption. COLLETTI explained that MILLER brands were becoming irrelevant to younger crowds and that distributors were moving away from on-premise distribution. COLLETTI explained that a distributor makes less in profit from on-premise distribution because there is much lower quantity sold to on-premise distribution locations versus off-premise distribution locations.

COLLETTI estimated that he became the Director of On-Premise National Accounts in approximately 1995 or 1996. At this time, COLLETTI estimated that approximately twenty people reported to him. Of these, two or three were direct reports to COLLETTI, and the rest were people reporting up through COLLETTI's direct reports. COLLETTI remained in the position of Director of On-Premise National Accounts until 2000 or 2001.

In approximately 2001, COLLETTI was promoted to the position of Senior Director of On-Premise National Accounts. At that time, KEVIN DOYLE was moved to the position of Regional Vice President of the East. DOYLE was switching positions with DOUG BROADMAN, who was previously Regional Vice President of the East. BROADMAN took on the title and position of Vice President of Chain Sales from DOYLE. COLLETTI advised that in the Senior Director position, there was more emphasis on the channel. COLLETTI explained that MILLER had reorganized the way it was going to market and was increasing support to the field employees. As Senior Director, COLLETTI was selling to national client accounts and was dealing with distribution to the national accounts. COLLETTI advised this time there were more imperatives of looking at the total on-premise channel.

As way of background, COLLETTI advised that in approximately 1996, COLLETTI came up with a program known as MRM, which stood for

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                    , On  04/29/2014  , Page  6 of 29

Merchandising Representatives from MILLER. COLLETTI introduced this
program in 1996, championed it in 1997, and MILLER officially introduced it
in 1998. Through the MRM program, MILLER hired people to augment
distributors in the marketplace. COLLETTI advised that distributors were
moving away from on-premise promotions for the large breweries and moving
towards distributing smaller micro-brewery beer that provided a bigger
margin. COLLETTI advised that the MRM program was put in place and did
some good, but there were changes in senior management positions in
approximately 2001 or 2002 that resulted in the watering down of the MRM
program. COLLETTI advised that the program was not totally eliminated, but
was watered down because the new senior managers believed it cost too much
money.

COLLETTI explained that the significant changes in senior
management he mentioned involved people in senior management positions at
MILLER being replaced with people from PHILIP MORRIS, which was MILLER's
parent company. Specifically, JACK McDONOUGH, the President of MILLER was
let go, along with CHRIS MOORE, the Vice President of Sales, and JACK
ROONEY, the Chief Marketing Officer. JOHN BOLIEN was named as the new
President, JOHN MORTENSEN was made the new Senior Vice President of Sales,
and there was a new Vice President of Marketing whose name COLLETTI could
not currently recall.

COLLETTI advised that MORTENSEN, the new Vice President of Sales,
believed that the MRM program was costing MILLER too much money. COLLETTI
believed that the MRM Program had been working, but new management wanted
more control over the MRM program because it was an expensive undertaking.
MORTENSEN took the position that the work could be done internally by
MILLER. As a result, MILLER switched from the MRM program to an internal
program where the work was no longer outsourced. COLLETTI advised that
MILLER kept parts of the MRM model in place, but the program was operated
internally with more internal controls in place.

COLLETTI explained that with both the MRM program and the
subsequent internal effort, MILLER was trying to get the distributors to
adhere to the contracts they had signed with MILLER. The contracts
specified the marketing and promotions agreed to by the distributors. When
the MRM program was brought internally, MILLER was trying to get the local
area managers and the employees in field to work with the distributors to
ensure that the distributors were doing what they were supposed to be doing
to promote and sell MILLER products. COLLETTI reiterated that the problem
MILLER was facing was that the local distributors were moving toward

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of _Interview of David Colletti_ _____ , On _04/29/2014_ , Page _7_ of _29_

distribution of smaller breweries where there was a higher margin of profit. COLLETTI advised that he was working with the local field employees to give them a strategy to use in dealing with these issues with the local distributors.

COLLETTI described another program at MILLER called Service 2000, which was created by CHRIS MOORE. COLLETTI described Service 2000 as changing the way MILLER used merchandising dollars. COLLETTI explained that instead of MILLER giving promotional items to the distributors as they traditionally had done, MILLER decided to let the distributors buy the promotional items instead. COLLETTI described the promotional items as "P.O.S.'s" which included paper products, neon signs, and brand/marketing items. COLLETTI explained that under the Service 2000 program, MILLER was going to help the distributors pay for the P.O.S. items by lowering the price that the distributors paid MILLER for beer. COLLETTI advised that the Service 2000 program ended up not working because often distributors would not buy the P.O.S. products that were intended to support the marketing and promotion of MILLER products. As a result of this change in the way MILLER used merchandising dollars, COLLETTI's on-premise channel could no longer direct any of the merchandising or promotional items to a specific on-premise account such as APPLEBEE's. As the distributor had to buy the merchandising items, the cost of the items was no longer included in the on-premise budget. Therefore, COLLETTI's channel was lacking the funds to provide these items to the on-premise chains.

After approximately two years in the position of Vice President of Sales, MORTENSEN went back to PHILIP MORRIS. At that time, DOUG BROADMAN was promoted to Executive Vice President of Sales, and REGENIA STEIN came in to replace BROADMAN as Vice President of Chain Sales. STEIN had previously worked at KRAFT.

COLLETTI advised these changes occurred in approximately 2004. COLLETTI advised that DOYLE was COLLETTI's supervisor until BROADMAN and DOYLE switched positions. BROADMAN then became COLLETTI's supervisor and continued to be until BROADMAN took over for MORTENSEN when MORTENSEN went back to PHILIP MORRIS. STEIN was brought in from KRAFT to take BROADMAN's position and STEIN then became COLLETTI's supervisor.

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of **Interview of David Colletti** , On **04/29/2014** , Page **8 of 29**

 

COLLETTI advised that STEIN remained his supervisor until approximately 2006, when she left to go back to KRAFT. At that time, PETER PAPPAS was brought in from PEPSI to be the Vice President of Chain Sales. PAPPAS was COLLETTI's supervisor until the merger between MILLER and COORS in 2008.

From approximately 2002 to 2008, COLLETTI was in the position of Senior Director of On-Premise National Accounts. In that position, COLLETTI had approximately twenty-one to twenty-two people that he supervised. COLLETTI's job duties included dealing with issues with the distributors and supporting the promotions put out by MILLER. COLLETTI was also responsible for meeting with representatives of the on-premise national accounts.

In 2005, PHILIP MORRIS sold MILLER to a company called SOUTH AFRICAN BREWERIES (hereinafter SAB). MILLER BREWING COMPANY's name was then changed to SAB MILLER. COLLETTI described this as a volatile time in the company. COLLETTI advised that SAB MILLER eventually put together a merger with COORS. In 2006, employees at SAB MILLER knew something was happening in the company. In 2007, MILLER and COORS announced their intention to merge, and in 2008, the merger between MILLER and COORS occurred. When SAB purchased MILLER in 2005, SAB brought in NORMAN ADIMIE from SAB to run SAB MILLER in Milwaukee. ADIMIE brought in TOM LONG to be SAB MILLER's Chief Marketing Officer. Prior to the merger between MILLER and COORS, ADIMIE went back to SAB in South Africa and LONG was named President of SAB MILLER.

As a result of the 2008 merger between MILLER and COORS, COLLETTI's new employer became known as MILLERCOORS. COLLETTI advised that everyone was "fired" from the two individual companies (MILLER and COORS), although the employees were still working for the companies. COLLETTI advised that the merger of MILLERCOORS was a merger not an acquisition. After the merger, SAB MILLER owned 58% of MILLERCOORS, and COORS owned 42% of MILLERCOORS. COLLETTI advised this was supposed to be the equal merger of the two companies, not an acquisition. After the merger, the President of COORS was named CEO of MILLERCOORS, and TOM LONG, the President of SAB MILLER was named President of MILLERCOORS.

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                      , On  04/29/2014  , Page  9 of 29

After the merger, COLLETTI's position became Vice President of
On-Premise National Accounts. COLLETTI advised that as a result of the
merger, the Vice President of Sales position was split between ED McBRIANE,
who was named Vice President of Sales West, and TOM CARDELLA, who was named
Vice President of Sales East. KEVIN DOYLE was named Chief Customer
Officer. COLLETTI explained that in this position, DOYLE had
responsibility over all chain sales.

COLLETTI described the organizational structure of MILLERCOORS
after the merger had TOM LONG as President, with ED McBRIANE, TOM CARDELLA,
and KEVIN DOYLE reporting to LONG. COLLETTI reported directly to DOYLE.
Twenty plus people reported to COLLETTI. Of the twenty employees who
reported to COLLETTI, three or four were team leads, and the remainder of
the employees were national account managers who reported to the team leads
and COLLETTI. The four team leads who reported to COLLETTI were as
follows: PHIL BLAVAT, who was responsible for concessions and casinos; RON
SCHROEDER, who was responsible for travel and leisure (which included
hotel, air, duty free and rail); PAUL EDWARDS, who was responsible for
BUFFALO WILD WINGS (BWW), TOBY KEITH's, and BAR MANAGEMENT GROUP; and MARK
LINDNER, who was responsible for restaurants. After LINDNER was promoted,
the restaurant group was taken over by JOHN BECK.

When COLLETTI's title changed to Vice President of On-Premise
National Accounts, COLLETTI's responsibilities also increased. COLLETTI
advised that his responsibilities increased in part from "a biometrics
standpoint." COLLETTI explained that before the merger, MILLER sold
approximately eighteen million cases of MILLER products per year. Prior to
the merger, COORS sold approximately five million cases of COORS products
per year. The total of sales for MILLER and COORS products after the
merger was approximately twenty-three million cases per year. When
COLLETTI left MILLERCOORS, MILLERCOORS was selling approximately
twenty-five or twenty-six million cases of MILLERCOORS products per year.
As a result of the additional sales brought in by COORS after the merger,
there was more product for the post merger employees to oversee.

COLLETTI advised that both MILLER and COORS individually thought
that bringing the two smaller companies together made sense because
approximately 50% to 60% of MILLER distributors were also distributing
COORS. COLLETTI advised that MILLER was fighting to keep distributors and
to secure retail space for MILLER products, as was COORS. COLLETTI

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                    , On  04/29/2014  , Page  10 of 29

explained that it made sense for the two companies to band together against ANHEUSER-BUSCH. COLLETTI advised that prior to the merger, ANHEUSER-BUSCH had approximately 50% of the market share, MILLER had approximately 20%, and COORS had approximately 10%. The remainder of the market was held by smaller breweries such as HEINEKEN, CORONA, PABST, and newly emerging smaller micro-breweries.

In order to explain the reason for some of his additional duties post merger, COLLETTI provided some background about the sales figures for the on-premise chain accounts. COLLETTI advised that nationwide there are approximately 250,000 on-premise licensed accounts where beer is sold. Of these 250,000 outlets available to the beer industry, only 3% to 4% are chain outlets. Nonetheless, the sales from the chain outlets represented approximately 22% of MILLERCOORS on-premise business. COLLETTI advised that after the merger in 2008, MILLERCOORS on-premise sales represented approximately 20% of total sales and off-premise sales represented approximately 79% of total sales. COLLETTI advised that the industry average is approximately 25% for on-premise sales and 75% for off-premise sales. Although MILLERCOORS on-premise percentages were down from the national averages, the national chain account share of on-premise business represented approximately 22% to 23% of the volume in the on-premise channel.

Based on the importance of the on-premise chain sales figures for MILLERCOORS, COLLETTI put together a business program where he brought in the regional chain employees from the field to teach them about the chain retailers' businesses. COLLETTI believed that the people from the field needed to understand the product costs, labor costs, and business practices of the on-premise chain retail customers of MILLERCOORS. COLLETTI believed that if the field and regional MILLERCOORS employees understood the chain businesses better they could increase their sales in those chains. COLLETTI explained that if a MILLERCOORS regional sales manager understood APPLEBEE'S business, then the MILLERCOORS regional sales manager could figure out how to increase MILLERCOORS sales in APPLEBEE'S. COLLETTI had taught this strategy within his own group prior to the merger. After the merger, COLLETTI took anyone who was in the on-premise channel, or had an on-premise title, and brought them in for week-long trainings twice a year. COLLETTI explained that he was teaching the field people about the chain customer's businesses in order to help the MILLERCOORS employees to sell the MILLERCOORS products to the chain customer.

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                        , On  04/29/2014 , Page  11 of 29

 

      In addition to the training responsibilities that COLLETTI took on after the merger, COLLETTI was also given an increased marketing budget to handle. Around the same time, COLLETTI was working with MILLERCOORS customers on how to adjust to recent pricing increases in the beer industry. COLLETTI explained that starting in 2006, there were significant increases in the price of a keg of beer. COLLETTI advised that the nationwide average for the cost of a keg of beer was $72.00. COLLETTI advised that currently the nationwide average for the cost of a keg of beer is approximately $105.00. COLLETTI advised there was no real reason for the increase in the price. COLLETTI advised that the nationwide average went up when ANHEUSER-BUSCH was purchased by InBev. ABInBev raised the prices on kegs of beer, and when this happened, all of the other breweries followed suit. COLLETTI advised that the result of the increased prices was that MILLERCOORS and the other breweries sold less beer; however, the increase in price allowed the breweries to make more money per keg of beer. Around the same time, the cost of deposits on kegs of beer was raised from $10.00 per keg to $20.00 per keg. COLLETTI advised that for an on-premise chain restaurant, such as APPLEBEE's or OUTBACK STEAKHOUSE, the increase in keg deposit cost the chain approximately $12 million or more. COLLETTI explained that he was responsible for working with the on-premise chains to deal with some of these pricing increases.

      COLLETTI explained that one of his responsibilities was as trying to get MILLERCOORS management and employees inside MILLERCOORS to understand what was going on with the on-premise retailers. In order to help this process, COLLETTI held "back to basics" training for employees in the field. COLLETTI advised that this involved training and mentoring staff in the on-premise chain channel, as well as working with employees in the marketing department to try to increase sales of MILLERCOORS products. COLLETTI was in the position of Vice President of On-Premise National Accounts from 2008 to the end of his employment with MILLERCOORS in 2013. COLLETTI reported to KEVIN DOYLE for the entire period he was in the position of Vice President of On-Premise National Accounts.

## FRAUDULENT INVOICING

      COLLETTI believes that the first time he participated in submitting fraudulent invoices to MILLER, or subsequently to MILLERCOORS, occurred in approximately 2006 or 2007. COLLETTI explained that when the

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of Interview of David Colletti    , On 04/29/2014 , Page 12 of 29

merger between MILLER and COORS was imminent, people were concerned about
job security. Around the same time, COLLETTI invested in a hotel and bar
in Waukesha, Wisconsin. COLLETTI advised that the hotel and bar were
eventually a big drain on his economic resources. COLLETTI estimated that
the investments were costing him approximately $30,000 per month. At the
same time his personal expenses were greatly increasing, COLLETTI was doing
things with money from his department's budget to "take care of" his
customers. COLLETTI explained that at times he would have extra money in
his budget and wanted to "take care of" his customers. Both internal
company policies and Federal and State regulations prohibited breweries
from doing certain things for customers. COLLETTI advised that he was
trying to figure out ways to get around these rules and regulations so he
could take care of his customers.

COLLETTI explained that part of the reason he had extra money in
his budget was that he was starting to make inroads with his retail
customers. COLLETTI was teaching his employees, who were in turn teaching
the customers, sound business advice in order to increase their sales. The
business advice was helping the retailers and so COLLETTI and his employees
did not have to waste promotional money in order help the customers. As a
result, there was a surplus in COLLETTI's budget. COLLETTI advised that
instead of giving up the extra money from his budget, COLLETTI tried to
find ways where he could put the money to use at a later date. At the same
time, COLLETTI was in need of large amounts of money to support his
investment in the hotel.

COLLETTI advised there were basically two types of fraudulent
invoices that he was involved in submitting to MILLER and/or MILLERCOORS.
For both types, COLLETTI would have someone act as a third party vendor and
put together an invoice for submission to MILLERCOORS. COLLETTI advised
that the people acting as third party vendors were people COLLETTI had
developed a relationship with over the years. COLLETTI advised that the
first type of fraudulent invoice was for an event or meeting that was never
going to happen. The second type of fraudulent invoice was for an event
that had happened in the past at a particular venue or on a regular basis
and was not going to happen this year or this time. COLLETTI advised that
these recurring events were most likely not to be questioned because they
had previously occurred. COLLETTI was then asked to identify the third
party vendors whom he used to submit fraudulent invoices to MILLER and/or
MILLERCOORS:

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti _____ , On  04/29/2014 , Page 13 of 29

### DREW VALLOZI

          DREW VALLOZI was COLLETTI's partner in the hotel investment in
Waukesha, Wisconsin.  COLLETTI advised that VALLOZI was an actual vendor
who did a lot of legitimate marketing for MILLER over the years.  VALLOZI
had won awards for his ideas and promotions for MILLER.  COLLETTI believes
he first met VALLOZI in 2005, when VALLOZI was doing work for MILLER.
VALLOZI came into MILLER and presented promotion ideas to MILLER.  VALLOZI
lived in Waukesha, as did COLLETTI at that time.  VALLOZI was associated
with the following third party vendors through whom VALLOZI and COLLETTI
submitted fraudulent invoices to MILLER and MILLERCOORS:  AVA MARKETING &
COMMUNICATIONS, LLC; AVA ADVERTISING, INC.; FOOD & BEVERAGE NETWORK.


          COLLETTI advised that AVA ADVERTISING, INC. was an actual company
that had previously been owned by VALLOZI's father.  VALLOZI bought AVA
ADVERTISING, INC. from his father.  COLLETTI agreed to co-sign one of the
loan documents for VALLOZI so that VALLOZI could purchase his father's
business.  After signing the loan documents, COLLETTI learned that the
company was a "black hole."  COLLETTI did not know that the company was not
profitable when COLLETTI signed the loan documents with VALLOZI.  COLLETTI
signed the loan documents because he believed the business would bring in
money for the hotel which was struggling financially.


          COLLETTI believed that he and VALLOZI first submitted a
fraudulent invoice to MILLER relating to an event that had happened in the
past, but was not going to happen again.  COLLETTI advised that he "felt
safe" invoicing MILLER for the event because the event had been held in the
past.  COLLETTI advised that he and VALLOZI submitted the fraudulent
invoice in order to obtain money towards the debts related to the hotel.
COLLETTI acknowledged that COLLETTI and VALLOZI both knew that VALLOZI was
submitting an invoice for an event was not going to happen and that money
was going to be used for the hotel debts.  ..


          COLLETTI was asked to describe the process by which VALLOZI and
COLLETTI would submit fraudulent invoices to MILLER and MILLERCOORS.
COLLETTI advised that VALLOZI would submit an estimate to MILLER or
MILLERCOORS for an event that was not going to happen.  The estimate would

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                      , On  04/29/2014  , Page  14 of 29

come to COLLETTI's department, which was On-Premise National Accounts.
COLLETTI advised that VALLOZI would either fax, e-mail, or send via U.S.
MAIL the initial estimate to MILLER or MILLERCOORS. The estimate would
either be sent to COLLETTI's attention or would go directly to the
accounting department, or to a promotions manager. In the scenarios where
the estimate went to the accounting department or to a promotions manager,
COLLETTI would have to approve the estimate. COLLETTI advised that someone
from the accounting department or the promotions manager would typically
call COLLETTI after receiving the estimate and ask COLLETTI if this was
what he wanted to do, meaning was he okay with whatever promotion had been
listed on the invoice. COLLETTI advised that his approval was required on
some estimates, but not others.

Once a third party vendor estimate was approved, the accounting
department at MILLER or MILLERCOORS would create a purchase order (P/O)
number. This process was applicable for both fraudulent estimates from
VALLOZI and the other third party vendors, as well as legitimate estimates
from third party vendors. COLLETTI confirmed that MILLER's accounting
department, to include accounts payable, was located in Milwaukee.
COLLETTI advised that the accounting department would send back a P/O
number to the third party vendor who submitted the estimate. COLLETTI
advised that if the third party vendor did not receive a P/O number from
the accounting department, the third party vendor would get an e-mail or
fax from COLLETTI's secretary, MARY ANN ROZENBERG, who provided the P/O
number.

On whatever date the event or promotion was to occur, VALLOZI or
any of the other third party vendors would submit an invoice back to MILLER
or MILLERCOORS listing the P/O number on the invoice. COLLETTI advised
that these would be submitted to MILLER the same way that the estimates
were submitted to MILLER or MILLERCOORS, to include e-mail, fax, or U.S.
MAIL. COLLETTI advised that the process for submitting invoices to MILLER
or MILLERCOORS was the same whether the invoices submitted by the third
party vendor were fraudulent or legitimate.

Third party vendors were paid by MILLER or MILLERCOORS within
thirty to sixty days after the date on which the invoice was submitted.
COLLETTI advised the invoices were paid by check. The accounts payable
department at MILLER in Milwaukee, Wisconsin, would send to the third party
vendor a check at whatever name and address was provided by the third party

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                    , On  04/29/2014 , Page  15 of 29

vendor. COLLETTI advised that some legitimate third party vendors were set
up for direct deposit payment of invoices from MILLER, however, COLLETTI
does not know if any of the third party vendors with whom he submitted
fraudulent invoices were set up for direct deposit.


COLLETTI confirmed that the process for VALLOZI submitting
fraudulent invoices to MILLER was the same as all of the third party
vendors with whom COLLETTI submitted fraudulent invoices. COLLETTI advised
that the only difference might have been with invoices created and
submitted by MARY ANN ROZENBERG.


COLLETTI was then asked what would happen with the money from the
checks that were issued to VALLOZI as a third party vendor. COLLETTI
confirmed that the three third party vendors used by VALLOZI on fraudulent
invoices were: AVA MARKETING & COMMUNICATIONS, LLC; AVA ADVETISING, INC.;
and FOOD & BEVERAGE NETWORK. COLLETTI's understanding from VALLOZI was
that the money from these fraudulent invoices went to pay off the debt and
expenditures related to the hotel and bar in which VALLOZI and COLLETTI had
invested. COLLETTI advised that the hotel was called THE CLARKE HOTEL and
the bar was named THE SOCIAL CLUB. COLLETTI advised that VALLOZI also
purchased an arena football team called THE MILWAUKEE IRON. COLLETTI was
not certain, but believes that money from fraudulent invoices to MILLER or
MILLERCOORS was used to pay debts and expenditures of the arena football
team. COLLETTI advised that it was also possible that the funds for the
arena football team came from COLLETTI personally. COLLETTI confirmed that
the hotel, bar, and arena football team were either owned jointly by
VALLOZI and COLLETTI, or COLLETTI had guaranteed the loans for the purchase
of each of the entities.


COLLETTI was not sure where VALLOZI had bank accounts, either
individually or for any of the three third party vendor companies that were
used to submit fraudulent invoices to MILLER or MILLERCOORS. COLLETTI
believes that the bank accounts may have been at COMMUNITY BANK. COLLETTI
received no substantial funds for his personal use from the fraudulent
third party vendor invoices submitted to MILLER or MILLERCOORS from AVA
MARKETING & COMMUNICATIONS, AVA ADVERTISING, INC., or the FOOD & BEVERAGE
NETWORK. COLLETTI believes there may have been an occasion when funds from
a fraudulent invoice were used to repay COLLETTI for a personal
expenditure. However, COLLETTI believes that the majority of these funds
were used to pay the debts and expenditures of the hotel and bar.

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                      , On  04/29/2014 , Page  16 of 29


      COLLETTI was asked if he recalled specific types of events or promotions that were listed by VALLOZI on the fraudulent third party invoices from AVA MARKETING & COMMUNICATIONS, AVA ADVERTISING, INC., or FOOD & BEVERAGE NETWORK. COLLETTI advised that he could not recall specific events and promotions that did not actually take place but were listed on the fraudulent invoices to MILLER or MILLERCOORS. COLLETTI advised that he would be able to identify the fraudulent invoices if given the opportunity to review all of the invoices submitted by VALLOZI or his third party vendor companies. COLLETTI advised there were also legitimate invoices from these entities that were for legitimate work performed by VALLOZI for MILLER or MILLERCOORS.

      COLLETTI has not had any contact with VALLOZI since the end of 2010. COLLETTI understood that VALLOZI is now living in Florida.

      COLLETTI was shown a driver's license photo of DREW VALLOZI. COLLETTI confirmed that the individual in the picture was DREW VALLOZI.


**MARY ANN ROZENBERG**


      MARY ANN ROZENBERG (maiden name is RODMAN) was COLLETTI's secretary at MILLER from approximately 1995 to 2008. COLLETTI advised that the merger between MILLER and COORS happened in 2008, and as a result of the merger, MILLERCOORS HEADQUARTERS was going to be moved to Chicago, Illinois. COLLETTI advised that ROZENBERG was unable to move to Chicago from Milwaukee, and therefore left her position with the company. COLLETTI understood from ROZENBERG that she was unable to sell her condominium in Milwaukee, and ROZENBERG's husband was a truck driver who was based out of Milwaukee. While COLLETTI was trying to help ROZENBERG find another job, ROZENBERG started a company called GOLDEN LOGISTICS. COLLETTI believed that GOLDEN LOGISTICS was started as a legitimate entity. ROZENBERG's idea for GOLDEN LOGISTICS was that the company would buy items from government surplus and resell the items at a profit. COLLETTI understood that GOLDEN LOGISTICS was going to transport the items as well as buying and selling the items.

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of __Interview of David Colletti__ , On 04/29/2014 , Page 17 of 29

       As a result of the merger, COLLETTI had to share a secretary. At the same time, ROZENBERG was not working as she was looking for new employment. As a result, COLLETTI had ROZENBERG do some secretarial work for him. COLLETTI confirmed this was work related to MILLERCOORS, even though ROZENBERG was doing the work at a time that she was no longer employed by MILLERCOORS. ROZENBERG was preparing documents for COLLETTI to use in presentations as well as completing COLLETTI's travel and entertainment (T&E) expense reports. COLLETTI explained that ROZENBEG was inputting COLLETTI's T&E expenses. ROZENBERG would log into the MILLERCOORS system, which COLLETTI believed was called the Concur System, using COLLETTI's log-in and password. ROZENBERG logged into the Concur System from her home using COLLETTI's log-in information. Because of the work that ROZENBERG was performing on COLLETTI's behalf, COLLETTI wanted to pay ROZENBERG. COLLETTI clarified that what he really wanted to do was help ROZENBERG find a job, but advised that was not working out. COLLETTI advised that ROZENBERG worked at THE CLARKE HOTEL on the second shift for a period of time.

       Although COLLETTI wanted to pay ROZENBERG for the work she was doing for COLLETTI, COLLETTI was limited in his personal finances. COLLETTI advised that his personal finances were limited due to the costs and expenses related to the investment in the hotel and bar. COLLETTI suggested to ROZENBERG that she submit an invoice to MILLERCOORS for an event or promotion that was not going to occur so that MILLERCOORS would pay ROZENBERG for the event or promotion. COLLETTI confirmed that the invoices from ROZENBERG did not relate to an actual event. Instead, the fake invoices were being submitted in order to get ROZENBERG money to "help her out" and to compensate ROZENBERG for the work she was doing for COLLETTI.

       COLLETTI advised that some or all of the fraudulent invoices submitted by ROZENBERG were done in a manner that was different from the other third party vendors. COLLETTI believes that the expenses submitted by ROZENBERG were put on a "P-Card." COLLETTI did not know what the name "P-Card" stands for, but advised that a "P-Card" was a MILLERCOORS credit card. Events costing up to $10,000 could be charged on the "P-Card". COLLETTI advised there was no overall limit to the expenditures that could be put on the "P-Card", however, there was a $10,000 per transaction limit. COLLETTI used the "P-Card" to pay GOLDEN LOGISTICS, which was ROZENBERG's third party vendor company. COLLETTI advised that the credit

FD-302a (Rev. 05-08-10)

· 318A-CG-4668147

Continuation of FD-302 of __Interview of David Colletti__ , On __04/29/2014__ , Page __18__ of __29__

card expenditure would then be assigned to an "I.O.". COLLETTI did not know what "I.O." stood for, but understood that it was basically a budget account number.

COLLETTI confirmed that ROZENBERG had some type of a merchant account in order to accept the payments from the "P-Card" credit card. COLLETTI did not know through which bank or credit card company ROZENBERG's merchant account was set up. COLLETTI advised that GOLDEN LOGISTICS was set up as an Illinois corporation. COLLETTI had suggested ROZENBERG that she should incorporate in Illinois when she was creating GOLDEN LOGISTICS. COLLETTI advised that the mailing address for GOLDEN LOGISTICS is a retail space associated with COLLETTI's brother's dentist's office in Lombard, Illinois.

COLLETTI was certain that over the last couple of years, all of the funds related to the fraudulent invoices from ROZENBERG were charged to the "P-Card". COLLETTI was not sure if prior to that, estimates and invoices were submitted to MILLER and whether ROZENBERG received any checks from MILLER or MILLERCOORS.

COLLETTI advised that no money that went to ROZENBERG's company came back to COLLETTI personally. COLLETTI confirmed that ROZENBERG submitted fraudulent invoices under third party vendor company names GOLDEN LOGISTICS and GOLDEN EVENTS AND PROMOTIONS. COLLETTI believes that the events listed on the invoices from ROZENBERG's third party vendors were tradeshow type events and promotions. COLLETTI confirmed that both he and ROZENBERG knew there never were going to be any actual promotions related to the invoices they were submitting to MILLER and MILLERCOORS.

COLLETTI was then shown a driver's license photo of MARY ANN ROZENBERG. COLLETTI identified the individual in the photo as MARY ANN ROZENBERG.

FRANK BUONAURO

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                    , On  04/29/2014 , Page  19 of 29

 

      COLLETTI first met FRANK BUONAURO in approximately 2000.
BUONAURO was the founder of the NATIONAL ASSOCIATION OF FLEA MARKETS and
was an owner of three large flea markets. COLLETTI advised that two of
BUONAURO's flea markets were located in Arizona, and one was located in
Florida. COLLETTI believes that BUONAURO may have sold one of the Arizona
flea markets to the State of Arizona. COLLETTI advised that BUONAURO was
the pioneer of flea market lobbying on behalf of flea markets from around
the country. COLLETTI advised that BUONAURO and the NATIONAL ASSOCIATION
OF FLEA MARKETS' biggest lobbying efforts were against WAL-MART and
WAL-MART's competition with the flea markets. BUONAURO had a company
called F&B MARKETING PROMOTIONS that was a third party vendor for MILLER
and MILLERCOORS.

      COLLETTI was introduced to BUONAURO when MILLER was trying to
gain market shares in the Hispanic communities. COLLETTI advised that flea
markets were seen as a good inroad to this end. COLLETTI explained there
were promotional opportunities at the flea markets, as well as beer sales
through beer tents set up at flea markets. Prior to COLLETTI convincing
BUONAURO to switch to MILLER products, ANHEUSER BUSCH products were sold at
BUONAURO's flea markets. COLLETTI advised that a lot of BUONAURO's friends
who were also flea market owners switched to MILLER products at BUONAURO's
suggestion.

      COLLETTI advised that he and BUONAURO went on hunting trips
together. The hunting trips were bird hunting trips in Florida. COLLETTI
estimated that he and BUONAURO went on one bird hunting trip a year for
approximately the last four years. COLLETTI advised that MILLERCOORS did
not pay for these trips, instead, BUONAURO submitted inflated invoices to
MILLERCOORS to cover the expenses of the trip. COLLETTI advised that
although both MILLER and COORS as individual companies allowed expenditures
relating to the hunting industry, after the merger, MILLERCOORS allowed no
funding of hunting related activities. COLLETTI thinks this related to
insurance issues.

      COLLETTI advised that the first time he and BUONAURO used
MILLERCOORS money to finance a hunting trip it did not relate to
fraudulently inflated invoices. Instead, COLLETTI believes the money was
left over from a legitimate flea market promotion. COLLETTI recalled that
BUONAURO asked COLLETTI what BUONAURO should do with the money that was
left over from the flea market promotion. BUONAURO asked COLLETTI if he

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                    , On  04/29/2014 , Page  20 of 29

should send the money back to MILLER.  COLLETTI told BUONAURO to hold on to
the money.  COLLETTI believes he may have said that they could use the
money to pay for a hunting trip.


        COLLETTI believes that all of his subsequent hunting trips with
BUONAURO were paid for with money from invoices to MILLERCOORS.  COLLETTI
explained that the invoices were for legitimate promotions by F&B MARKETING
PROMOTIONS that were padded with extra expenditures to pay for the hunting
trips.  COLLETTI estimates the trips cost approximately $7,000 to $10,000
per trip.  COLLETTI estimates that he and BUONAURO took one trip per year
over the past three or four years.  COLLETTI believes that he and BUONAURO
may have discussed creating a third party entity to accept promotional
money from MILLERCOORS.  COLLETTI is not sure if BUONAURO started F&B
MARKETING PROMOTIONS in order to accept fraudulently inflated third party
vendor invoices, or if the entity already existed.


        COLLETTI advised that prior to the last three or four years, all
of the invoices from BUONAURO were legitimate.  The invoices related to
legitimate work and promotional costs.  COLLETTI advised that MILLER
legitimately spent promotional money on trying to establish a presence in
the flea markets.  COLLETTI advised that MILLER also paid money to support
training efforts of the NATIONAL ASSOCIATION OF FLEA MARKETS.  This was
accomplished by either giving money directly to the NATIONAL ASSOCIATION OF
FLEA MARKETS or to BUONAURO for the benefit of the NATIONAL ASSOCIATION OF
FLEA MARKETS.  COLLETTI advised that MILLER supported the NATIONAL FLEA
MARKET ASSOCIATION's lobbying efforts which resulted in the NATIONAL FLEA
MARKET ASSOCIATION and its members switching to MILLER products.  COLLETTI
recalled that at some point ANHEUSER BUSCH came back to BUONAURO and agreed
to support the NATIONAL ASSOCIATION OF FLEA MARKETS in its lobbying efforts
in an attempt to get ANHEUSER BUSCH products back into the flea markets.
COLLETTI recalled that as a result, some of the flea markets switched back
to selling and promoting ANHEUSER BUSCH products.


        COLLETTI did not directly receive any of the funds from the
inflated invoices BUONAURO submitted to MILLERCOORS.  Instead, the inflated
invoices from BUONAURO were used solely to pay for the cost of COLLETTI's
and BUONAURO's hunting trips.  COLLETTI purchased his own plane tickets to
fly to Florida for the hunting trips.  COLLETTI advised that the money from
the inflated invoices was used to cover the lodging, meals, entertainment
and cost of hunting on the trips.  COLLETTI understands that BUONAURO has

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti _____ . On  04/29/2014 , Page  21 of 29

two homes, one in Florida, and one in Arizona. COLLETTI believes that Florida is BUONAURO's primary residence.


COLLETTI was shown a driver's license photo of FRANK BUONAURO. COLLETTI identified the individual in the photo as FRANK BUONAURO.


## ROD GROETZINGER


COLLETTI advised that he met ROD GROETZINGER in approximately 1993. GROETZINGER was associated with the following three companies: BEVERAGE INDUSTRY MARKET SERVICES (BIMS); EVENTS MARKETING NETWORK; and RAVE MEDIA. COLLETTI advised that all three of these entities are legitimate companies.


COLLETTI fist met GROETZINGER when GROETZINGER owned a magazine called TOP SHELF MAGAZINE. COLLETTI advised that MILLER paid for advertisements in TOP SHELF MAGAZINE. GROETZINGER sold TOP SHELF MAGAZINE and then started F&B MAGAZINE. COLLETTI advised that GROETZINGER was both selling advertising space to MILLER in his magazines and was representing MILLER at tradeshows. COLLETTI recalled that GROETZINGER also produced a trade publication for MILLER that was called "Beer Is Volume With Profit." COLLETTI advised that GROETZINGER was a legitimate third party marketer who did a lot of work with COLLETTI and MILLER for many years.


COLLETTI advised that he did not have a whole lot to do with GROETZINGER when they first met in 1993. However, as TOP SHELF and F&B were both directed to on-premise retailers, it was a natural progression for COLLETTI to start working with GROETZINGER as COLLETTI moved into the on-premise channel. COLLETTI advised that for many years, GROETZINGER did legitimate work for COLLETTI's department and for all of MILLER and MILLERCOORS.


COLLETTI understood that GROETZINGER got into some financial difficulties in approximately 2006 or 2007. At this time, COLLETTI started "helping him out." COLLETTI explained that this entailed COLLETTI "seating

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti _____ , On  04/29/2014 , Page  22 of 29

some money" with GROETZINGER. This meant that when COLLETTI had extra money in his budget, COLLETTI would pay GROETZINGER for programs that COLLETTI might need GROETZINGER to conduct in the future. COLLETTI confirmed that in addition to "seating money" with GROETZINGER for programs that were going to occur in the future, there were also instances where COLLETTI was having GROETZINGER submit fraudulent invoices for events that were never going to occur. COLLETTI advised these were invoices he described as an established expense or a continuation of an event that had previously occurred, but was not going to occur this time. COLLETTI explained these types of established expenses were not typically questioned by MILLER or MILLERCOORS.

COLLETTI reiterated that there were times when COLLETTI "seated money" with GROETZINGER for programs or projects that COLLETTI would have GROETZINGER fulfill in the future. COLLETTI explained that GROETZINGER would develop promotional ideas and concepts at COLLETTI's request. GROETZINGER also provided training at COLLETTI's request. This would include the training of servers in the chain establishments and training of COLLETTI's employees. COLLETTI advised that GROETZINGER specialized in draft beer training. COLLETTI advised that the draft beer training was either provided to COLLETTI's employees or directly to representatives of MILLER's on-premise accounts. COLLETTI was confident that some of these promotions or trainings were conducted at a later time than the date of the invoice. COLLETTI could not specifically identify which trainings or programs were held at a later time, but invoiced to MILLER or MILLERCOORS with an inaccurate date or description.

COLLETTI advised that GROETZINGER used the same general process COLLETTI previously described for the submission and payment of fraudulent invoices. GROETZINGER would ask COLLETTI for an advance or COLLETTI would tell GROETZINGER that COLLETTI had extra money in the budget and that GROETZINGER should not submit an invoice. COLLETTI reiterated that GROETZINGER did a lot of work for MILLER up to a certain point in time.

COLLETTI believes the submission of the fraudulent invoices from GROETZINGER started at the end of 2005, or early in 2006. COLLETTI advised that GROETZINGER and VALLOZI were the first third party vendors that COLLETTI used for the submission of fraudulent invoices. COLLETTI believes that invoices were submitted to MILLER and MILLERCOORS from GROETZINGER's companies up until January 2013. COLLETTI advised that GROETZINGER was

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                    , On  04/29/2014 , Page  23 of 29

doing some work for MILLERCOORS in recent years, to include putting
together a web page for MILLERCOORS. COLLETTI advised that for the last
three years of invoices some were related to legitimate work, and some were
not.


        COLLETTI received all the funds from the fraudulent invoices
submitted to MILLER and MILLERCOORS from GROETZINGER's companies. COLLETTI
advised that GROETZINGER did not receive a portion of any of these funds.
COLLETTI believes that GROETZINGER was giving COLLETTI all of the funds
from the fraudulent invoices over the past three years because of COLLETTI
and GROETZINGER's friendship over the years and because GROETZINGER was
getting legitimate business from COLLETTI and MILLERCOORS. COLLETTI
advised there was a gap of time between 2006 or 2007, when the fraudulent
invoices started, and 2013, when they ended, that there were not any
invoices being submitted by GROETZINGER to MILLER or MILLERCOORS.


        COLLETTI advised that over the last three years, GROETZINGER was
submitting invoices to MILLERCOORS listing the event as a BIMS Draft
Training Program. COLLETTI advised these Draft Training Programs had been
held in the past in Las Vegas. The Draft Training Programs were no longer
be held, but were used as the basis for the fraudulent invoices. Prior to
the last three years of COLLETTI's employment with MILLERCOORS, GROETZINGER
was doing a lot of promotion for MILLERCOORS and MILLER. COLLETTI advised
that some of the promotions were legitimate and some were not. COLLETTI
advised these promotions were not specific to Las Vegas. COLLETTI advised
that these promotions and events were an assortment of things and were not
specific to BIMS.


        COLLETTI received funds from GROETZINGER related to the
fraudulent invoices either by check or money order. COLLETTI believed that
most of the fraudulent invoices over the past three years were from BIMS.
COLLETTI assumes that MILLER and MILLERCOORS sent checks to BIMS as payment
for the fraudulent invoices. COLLETTI is not sure if it was a BIMS account
or another entity's bank account that was used to pay the funds to
COLLETTI. COLLETTI believes that the money he received from GROETZINGER
went into a business account he controlled, which would have been DAC
MANAGEMENT, or possibly COLLETTI's personal account. COLLETTI advised that
the money he received from GROETZINGER related to the fraudulent invoices
was spent either on personal life expenditures or on debts related to the
hotel and bar.

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                    , On  04/29/2014 , Page  24 of 29

COLLETTI was shown a driver's license photo of GROETZINGER.
COLLETTI identified the individual in the photo as ROD GROETZINGER.


JIM RITTENBERG and SCOTT DARST


COLLETTI met JIM RITTENBERG and SCOTT DARST in approximately
1988, when RITTENBERG and DARST were running DITKA's Restaurant in Chicago,
Illinois.  At the time, COLLETTI was the On-Premise Regional Manager for
Chain and was based in Chicago.  RITTENBERG and DARST were customers of
COLLETTI's as DITKA's was an on-premise account.  COLLETTI advised that
RITTENBERG and DARST were customers of COLLETTI'S over the years through
their ownership of various restaurants which included: DITKA's, THE BEACH
in Las Vegas, and WHITEY HERZOG's in St. Louis.  In addition to these
retail ownerships, RITTENBERG and DARST also had a consulting business
known as PRIME PROMOTIONS.  COLLETTI confirmed that RITTENBERG and DARST
also used the name P.D. MARKETING, INC. as a third party vendor on
marketing and promotion invoices submitted to MILLER and MILLERCOORS.


COLLETTI advised that RITTENBERG now lives in Chicago, and DARST
lives in Las Vegas.  At the time COLLETTI met RITTENBERG, RITTENBERG was
described as "The Mayor" of Rush Street.  COLLETTI advised that everything
that happened on Rush Street went through RITTENGERG.  Through their
working relationship when RITTENBERG and DARST were running DITKA's,
COLLETTI, RITTENBERG and DARST became friends.  COLLETTI advised that
RITTENBEG and DARST taught COLLETTI about the business and they stayed in
touch over the years.


COLLETTI advised that in the early 2000's, MILLER was trying to
get into the business of supplying MILLER products to the Indian Gaming
Casinos.  COLLETTI advised that the Indian Gaming Business started in the
mid-1990's with two casinos in Upstate New York or the Northeast called
FOXWOOD and MOHEGAN SUN.  COLLETTI was trying to get MILLER products into
FOXWOOD and MOHEGAN SUN because he believed it would be a profitable
endeavor.  COLLETTI had heard that DARST had been successful in introducing
products into a casino in Florida with the Seminole Tribe, so COLLETTI

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti _____ , On  04/29/2014 , Page  25 of 29

reached out to DARST for help. With DARST and RITTENBERG's help, COLLETTI
was able to get MILLER products into the HOLLYWOOD CASINO, which was the
casino in Florida run by the Seminole Tribe. They were also successful in
getting MILLER products into the MOHEGAN SUN CASINO in New York, which was
run by the Mohegan Tribe, and the FOXWOOD CASINO in New York, which may
have been run by the Pequot Tribe. COLLETTI believes that DARST and
RITTENBERG also helped COLLETTI introduce MILLER products to a casino in
California. COLLETTI advised that DARST was the primary lead for the
Florida casino and RITTENBERG was the lead for the casinos in New York.


        During the time COLLETTI was working with RITTENBERG and DARST to
gain the entry into the Indian Reservation casinos, COLLETTI had added
people to his department to be in charge of the Indian Reservation casino
accounts. COLLETTI advised that after the initial contact had been made,
and a relationship had been established between MILLER and the Indian
Reservation casinos, MILLER wanted to turn the responsibility of managing
the Indian Reservation accounts over to the MILLER people working in the
field. As a result, there became a time where there was no longer a need
for RITTENBERG and DARST's help. COLLETTI advised that while RITTENBERG
and DARST were working to introduce MILLER products into the casinos,
RITTENBERG and DARST were paid a consulting fee. COLLETTI advised that the
payments were called something other than consulting fees. COLLETTI
advised that he was not allowed to hire consultants, so RITTENBERG and
DARST were being paid as third party vendors doing promotions. COLLETTI
believed it was some type of MILLER company regulation or policy that
prohibited the payment of consulting fees. COLLETTI believed that MILLER
did not want to pay for third party consultants.


        COLLETTI approximated that from 2002 to 2006, RITTENBERG and
DARST were consulting for MILLER in order to get MILLER products into the
Indian Reservation casinos. During that time, DARST and RITTENBERG were
being paid as third party vendors doing promotions. COLLETTI advised that
during this time, DARST and RITTENBERG were doing some promotions and
training. COLLETTI advised that invoices being submitted to MILLER for
RITTENBERG's and DARST's work are for legitimate work, but the work was
being described as something other than what it actually was.


        COLLETTI advised that there was a decision made in 2004 or 2005
that the management of the relationship with the Indian Reservation casinos
was going to be managed internally by MILLER. COLLETTI believed the

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti _____ , On  04/29/2014 , Page  26 of 29

process of turning over these responsibilities to MILLER employees
concluded in 2006 or 2007. When this process was wrapping up in 2006 or
2007, COLLETTI, RITTENBERG and DARST began submitting fake invoices to
MILLER for work that was not actually done.

COLLETTI advised that the invoices submitted by RITTENBERG and
DARST came from TIME PROMOTIONS, INC. and PD MARKETING, INC. COLLETTI
explained that the invoices from RITTENBERG and DARST listed the type of
work that RITTENBERG and DARST had done in the past for MILLER, but was no
longer being done. COLLETTI listed this type of activity on fraudulent
invoices because he believed that those invoices were less likely to be
questioned by MILLER.

COLLETTI advised that all of the third party invoices from PRIME
PROMOTIONS, INC. and PD MARKETING, INC., on behalf of RITTENBERG and DARST,
were promotions related to the Indian Reservation casinos. COLLETTI
advised that any of the invoices to MILLER or MILLERCOORS after 2006 or
2007 are not legitimate invoices. COLLETTI advised that the process for
the submission of the fraudulent invoices from RITTENBERG and DARST was the
same as the general process for all fraudulent third party vendor invoices
for which COLLETTI was involved. COLLETTI advised this general process was
used by both PRIME PROMOTIONS, INC. and PD MARKETING, INC., for the
submission of fraudulent invoices and receipt of payment of those invoices
by MILLER and MILLERCOORS.

COLLETTI advised there was a 50/50 split of the proceeds of the
fraudulent invoices submitted by RITTENBERG and DARST. COLLETTI received
50% of the proceeds and RITTENBERG and DARST split the other 50%.
COLLETTI, RITTENBERG and DARST all knew that COLLETTI and DARST were both
in financial trouble. COLLETTI explained that the idea or plan for
submitting fraudulent invoices to MILLER came about as both COLLETTI and
DARST were in financial trouble. COLLETTI explained that unlike COLLETTI
and DARST, RITTENBERG did not need the money.

COLLETTI received his 50% of the proceeds from the fraudulent
invoices to MILLER and MILLERCOORS in cash and checks from RITTENBERG.
COLLETTI advised the checks were personal checks from RITTENBERG.
RITTENBERG would physically hand the cash or checks to COLLETTI. The

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of Interview of David Colletti                           , On 04/29/2014 , Page 27 of 29

checks from RITTENBERG were deposited into the DAC Management Account at
COMMUNITY BANK or into a personal account of COLLETTI's. COLLETTI spent
the funds from the fraudulent invoices submitted by RITTENBERG and DARST on
personal expenditures as well as the debt related to the hotel and bar.

COLLETTI estimated that he received approximately $250,000 in
checks from RITTENBERG. COLLETTI advised that he received the rest of the
money from RIITENBERG in cash. COLLETTI was asked if this meant that he
received approximately $1.25 million in cash from RITTENBERG, as the total
payments to PRIME PROMOTIONS, INC. and PD MARKETING, INC. for fraudulent
invoices was estimated to be $3.0 million and 50% of that would be $1.5
million. COLLETTI acknowledged that he received a lot of cash from
RITTENBERG. COLLETTI advised that he received the money over a six year
period, but he confirmed that number was correct. COLLETTI was asked if
there was a reason why RITTENBERG had given him so much of the money in
cash. COLLETTI acknowledged that cash was harder to trace and at times
COLLETTI needed cash right away to pay vendors related to the hotel.

COLLETTI was shown driver's license photos of RITTENBERG and
DARST, which he identified as the individuals discussed herein.

**PAUL EDWARDS**

COLLETTI advised that PAUL EDWARDS was a MILLERCOORS employee who
worked for COLLETTI. EDWARDS was the Team Lead for BWW, TOBY KEITH and BAR
MANAGEMENT GROUP RESTAURANTS. COLLETTI advised that EDWARDS was only
involved in putting in fraudulent invoices to MILLERCOORS that related to
golf outings with TOM LONGHI. COLLETTI estimated that EDWARDS submitted
four or five invoices over the last three or four years for events that did
not happen on the dates listed on the invoices. COLLETTI explained that
the trips would occur at a later time. COLLETTI advised that EDWARDS,
LONGHI, COLLETTI and some retail customers and distributors, went on these
golf trips.

COLLETTI explained that this was a situation where there was
money in the bank now and they wanted to use it later. COLLETTI explained

FD-302a (Rev. 05-08-10)

318A–CG–4668147

Continuation of FD-302 of __Interview of David Colletti__ , On __04/29/2014__ , Page __28 of 29__

that there was extra money in his budget that he did not want to lose so
either COLLETTI, or on four or five occasions EDWARDS, would submit an
invoice for a golf trip that did not happen at the time, or did not happen
at the location that was listed on the invoice. COLLETTI advised that
these funds would be used to fund a later golf event.

COLLETTI advised that LONGHI would take a portion of the money
that had come in through the fraudulent invoice to cover his time, expenses
and golf fees related to the subsequent golf trip.

COLLETTI advised that some of these invoices related to golf
trips to Costa Rica. LONGHI's cousin was a golf pro at a golf course
called LA IGUANA in Costa Rica. COLLETTI advised that to pay for the trips
to Costa Rica, they used funds that had been paid by MILLERCOORS to LONGHI
through the submission of fraudulent invoices. COLLETTI advised that funds
from fraudulent invoices were also used to pay for golf trips to Florida,
where they golfed on expensive golf courses in the West Palm Beach area.

COLLETTI confirmed that EDWARDS went on some of the golf trips to
Florida and Costa Rica. COLLETTI does not believe that EDWARDS received
any money directly from LONGHI related to the fraudulent invoices, however,
COLLETTI is not certain.

COLLETTI confirmed that in addition to the invoices submitted to
MILLERCOORS by LONGHI at EDWARDS' direction, COLLETTI directed LONGHI to
submit additional fraudulent invoices to MILLERCOORS. COLLETTI thinks
EDWARDS might have been aware of the invoices COLLETTI instructed LONGHI to
submit, but COLLETTI is not certain.

COLLETTI advised that eventually LONGHI gave money to COLLETTI
personally from the fraudulent LONGHI golf invoices. COLLETTI does not
know if EDWARDS knew that money was coming back directly to COLLETTI, but
EDWARDS knew that COLLETTI was in financial trouble.

FD-302a (Rev. 05-08-10)

318A-CG-4668147

Continuation of FD-302 of  Interview of David Colletti                    , On  04/29/2014 , Page  29 of 29


      The interview of COLLETTI was concluded at this point due to time constraints.  COLLETTI agreed to meet with the interviewing Agents again in order to provide additional information and details related to his employment at MILLER and MILLERCOORS and the activities discussed herein.